SUPERIOR COURT 
 
 COMMONWEALTH VS. ALBERTO SANTANA

 
 Docket:
 1977CR00458
 
 
 Dates:
 August 31, 2020
 
 
 Present:
 /s/Jeffrey T. Karp Associate Justice, Superior Court
 
 
 County:
 ESSEX, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND EVIDENTIARY HEARING (Paper No. 7) 
 
 

             Defendant Alberto Santana ("Santana") is charged with several drug trafficking and firearms offenses arising from a long-term police investigation of a sophisticated drug trafficking organization that operated in Lawrence and Methuen. He has moved to suppress evidence (i.e., drugs and firearms) seized by the police pursuant to a search warrant on June 19, 2019, in a room in the basement of the building at 15 — 17 Ames St., Lawrence.
            On July 21, 2020, the Court conducted an evidentiary hearing on Defendant's Motion To Suppress Evidence And Evidentiary Hearing ("Motion") (Paper No. 7). The Court heard testimony from Massachusetts State Police ("MSP") Troopers Mark O'Brien ("O'Brien") and Robert Noonan ("Noonan"), Segundo Santos ("Santos"), and Haydee Grullon ("Grullon").[1] The Court also received 31 exhibits in evidence.
---------------------------
[1] Although Santana did not testify, he did call Santos and Grullon to testify. Ms. Grullon testified via video at Santana's request as she failed the Covid-19 screening protocol. See SJC's Second Order Regarding Public Access To State Courthouses & Court Facilities.
                                                            Page 1 of 26
            As is fully explained below, after thorough consideration of the submissions and arguments of counsel, and the evidence presented at the hearing, the Motion is DENIED.
I. FINDINGS OF FACT
            The Court makes the following findings, which are based on the credible evidence produced at the hearing and the reasonable inferences that the Court has drawn from the evidence.[2] With respect to the four aforementioned witnesses that testified at the hearing, the Court finds that their testimony was truthful and accurate on the relevant and material points. Thus, the Court credits their testimony on the relevant and material points.[3]
A. FINDINGS OF FACT FROM THE SEARCH WARRANT AND ITS  SUPPORTING DOCUMENTS 
                        1. Application For Search Warrant
            On June 18, 2019, Noonan and Sgt. Daniel Clemens ("Clemens") of the MSP jointly applied to the Essex Superior Court for a search warrant.[4] The application for search warrant sought permission to search for heroin, fentanyl, and cocaine, and evidence of drug distribution activities. See Ex. 1, Search Warrant, Addendum A. The application requested permission to search for those items at "15 Ames Street, Rear Apartment, Lawrence, MA, see Addendum B, which in [sic] incorporated herein by
---------------------------
[2] The Court sets forth additional Findings of Facts in the Discussion section, infra.
[3] The Court has separated its Findings of Fact into two general sections: Findings made from the four corners of the Search Warrant and its supporting documents, and Additional Findings made from the evidence presented at the hearing on the Motion.
[4] The search warrant, application for search warrant, affidavit in support, and the search warrant return were entered into evidence at the hearing as Exhibit 1.
                                                            Page 2 of 26
reference, which is occupied by and/or in the possession of: Alberto Santana (DOB 02/23/1983)." In support of the Search Warrant, Noonan and Clemens submitted an affidavit containing 290 pages, including 548 separately numbered paragraphs ("Affidavit").
                        2. Issuance Of Search Warrant / Place To Be Searched 
            On the same date, a Judge of the Superior Court granted the application and issued a search warrant, authorizing the search of "15 Ames Street, Rear Apartment, Lawrence, MA, . . . which is occupied by and/or in the possession of: Alberto Santana (DOB 02/23/1983)" ("Search Warrant"). In Addendum B, which was attached to, and incorporated in, the Search Warrant, the place to be searched is further described "as a multi-unit residence" with "a main entryway [that] is inside of a small porch" located on Ames Street. Addendum B further states that approximately halfway down an alley on the left side of the house "is a set of stairs that leads to a [particularly described] white door, [with] a small awning above it." Also, Addendum B states that "[t]his is the door that Alberto Santana [ ] has consistently used to access the residence. We .. . believe it leads to a rear apartment." Finally, below the aforementioned description of the side door in Addendum B is a color image of the front of the house with a red circle over the walkway area where the door "consistently used" by Santana is located.
                        3. Start Of Investigation 
            In fall 2017, Noonan, Clemens and other investigators from the MSP and Drug Enforcement Administration ("DEA") began investigating a narcotics distribution network in the Lawrence area. The initial target of the investigation was Robinson Adames Abreu ("Abreu"), who investigators suspected was selling fentanyl, heroin, and cocaine
                                                            Page 3 of 26
in the Lawrence area. Investigators learned cell phone numbers used by Abreu and identified "runners" he used to deliver drugs to buyers. Investigators also learned two locations Abreu used to distribute and store ("stash") drugs: an auto body garage located at 333 Methuen St., Lawrence ("Garage") and an apartment at 46 — 48 Cypress Ave., Methuen.
                        4. Undercover Controlled Purchases of Drugs 
            Clemens eventually arranged eleven undercover purchases of drugs (heroin, fentanyl, and cocaine) from Abreu between November 6, 2017, and March 14, 2019.[5] All occurred in Lawrence. Abreu was present for some of the drug sales and his runners conducted the other transactions.[6] Some of the controlled buys occurred near the Garage.
5. Expansion Of Investigation Via Wiretaps, GPS Tracking  Devices, Etc., To Include Santana 
            On March 25, 2019, investigators obtained a wiretap search warrant for a phone number used by Abreu during the controlled buys. This allowed investigators to listen to conversations and read text messages conducted on the cell phone associated with that phone number.
            Beginning on March 26, 2019, investigators intercepted numerous daily communications during which Abreu coordinated the purchase and sale of narcotics. Over the course of the next several weeks, investigators obtained wiretap warrants for
---------------------------
[5] The first ten controlled purchases occurred in November 2017, December 2017, January 2018, March 2018, and August 2018. The eleventh controlled purchase of narcotics occurred on March 14, 2019.
[6] The other transactions were conducted by the following "runners" employed by Abreu: Nelson Rivera, Isaac Rivera, Jhonny Mota-Rodriguez, and Jose Lugo-Garcia.
                                                            Page 4 of 26
numerous phones associated with Abreu, his runners, his drug suppliers, and many other members of his drug distribution network, including a phone number used by Santana.
            As a result of intercepted communications, investigators identified Santana as one of Abreu's drug suppliers. Records of the Registry of Motor Vehicles ("RMV") revealed that Santana registered two vehicles at 81 Stearns Ave., Lawrence. Investigators believed that Santana lived at that location and used an apartment at 15 Ames St., Lawrence, as a stash house.
            Further, investigators obtained search warrants that allowed them to affix GPS tracking devices on vehicles used by Abreu, Santana, and at least two of Abreu's runners identified by investigators: Jose Lugo-Garcia ("Lugo-Garcia") and Jhonny MotaRodriguez. They also obtained CSLI and other data regarding cell phones used by them and installed pole cameras outside several locations associated with drug distribution activities.[7] The tracking devices, CSLI, pole cameras, and wiretaps allowed investigators to observe and listen to the men coordinate and execute numerous drug transactions during April and May 2019.
---------------------------
[7]On August 6, 2020, the SJC ruled in Commonwealth v. Mora, 485 Mass. 360 (2020), for the first time that the surveillance of a person's residence for more than two months by use of a pole camera is a "search" under Article 14 of the Massachusetts Declaration of Rights and, prospectively, requires a search warrant. Id. at 376. On August 28, 2020, Santana filed a Supplemental Motion To Suppress Evidence In Light Of The Court's Decision in Mora (Paper No. 20) ("Supplemental Motion"), in which, citing Mora, he requests the suppression of evidence produced by the pole camera. Because the parties did not previously argue or brief it, the Court does not address the impact of the holding in Mora in this Decision. The Court will conduct a hearing on the Supplemental Motion and reconsideration its Decision herein, if necessary.
                                                            Page 5 of 26
            As the investigation continued, officers intercepted communications in which Nelson Galan ("Galan") coordinated the purchase of a kilo of cocaine from Santana on behalf of Omar Acevedo ("Omar").[8]
                        6. 572 Essex St., Lawrence, Apartments 2C, 3C, and 6B
            Officers eventually learned that Galan and Omar were working together for a large drug trafficking organization ("DTO") run by Ramon Cruz Gonzalez ("Cruz Gonzalez") and operated from an apartment building located near the Garage at 572 Essex St., Lawrence ("Apartment Building"). Officers determined that the DTO used three apartments inside the Apartment Building as its operational center (i.e., Apartments 2C, 3C, and 6B). Apartment 2C is located on the second floor, Apartment 3C is on the third floor, and Apartment 6B is on the sixth floor. Members of the DTO freely accessed all three apartments.
                        7. Further Communications By And Between Santana And  Members Of The DTO
            Investigators learned that Jocheiry Acevedo-Hernandez ("Acevedo-Hernandez") played a significant role in the DTO, especially as a drug "mixer," and that he lived and worked at Apartment 6B. Also, investigators observed Acevedo-Hernandez at the Garage and intercepted him conducting many DTO-related communications with Santana.
            In communications between Omar, Galan and Santana, they coordinated both purchases and sales of drugs. In addition, investigators continued to observe drug transactions conducted near and inside the Garage.
---------------------------
[8] Because other persons involved have the same surname, the Court will refer herein to Omar Acevedo by his first name.
                                                            Page 6 of 26
            On April 30 and May 1, 2019, Santana communicated with Galan and facilitated the purchase of a kilogram of narcotics. Galan referred to Acevedo-Hernandez during one of the communications. Later, on May 1, investigators observed Santana exit the Apartment Building at the scheduled time of the transaction and drive toward 81 Stearns Ave.
                        6. Santana's Stash Location At 15 Ames St., Lawrence, MA 
            In the Affidavit, the affiants describe numerous intercepted communications among Santana, members of the DTO, and other unknown persons during which Santana negotiated and arranged the purchase and sale of narcotics. Many of those intercepted communications were contemporaneous, or close in time, with instances during which investigators observed Santana travel to and enter 15 Ames, exit a short time later, and then drive to the planned sites of the drug transactions, such as the Apartment Building and Garage.
            To be sure, the affiants describe 14 instances in the Affidavit between April 17, 2019, and June 7, 2019, during which, on the heels of being intercepted communicating about the purchase and sale of drugs, investigators observed Santana enter 15 Ames St. and exit minutes later.[9]
            For example, on May 6, 2019, investigators intercepted communications between Acevedo-Hernandez and Santana in which Acevedo-Hernandez told Santana that Cruz Gonzalez needed "a kilo." Later that day, officers saw Santana arrive and enter 15 Ames Street with an object in his hand. Santana exited two minutes later carrying a
---------------------------
[9] With respect to the 14 times officers observed Santana enter and exit 15 Ames St., Santana typically stayed inside for two to 20 minutes, although on two such occasions Santana remained inside for at least 54 minutes.
                                                            Page 7 of 26
black bag, and drove to the Apartment Building. Upon arrival, Santana called Acevedo-Hernandez and told him to "open up." Acevedo-Hernandez directed Santana to "the sixth floor" (i.e., Apartment 6B). The following day, Santana contacted Acevedo-Hernandez and arranged payment for the previous day's drug transaction. Acevedo-Hernandez told Santana to go to the second floor of the Apartment Building (i.e., Apartment 2C). Shortly thereafter, Santana was observed exiting the Apartment Building and driving away.
            Another example occurred on May 21, 2019, when officers observed Santana enter 15 Ames St., and exit 26 minutes later. While exiting, Santana communicated that "I'm coming now" and the recipient replied, "Go close to the garage." Officers then observed Santana drive directly to the Garage, enter the Garage, and exit one minute later. The affiants reasonably concluded that Santana obtained drugs at 15 Ames St. and sold them at the Garage.
            Of the 14 aforementioned instances described by the affiants of Santana entering and exiting 15 Ames St., Santana used the front door of the building on three such occasions and used a basement door on the right side of the building on one other occasion. The affiants did not specifically describe the doors used by Santana during the other ten occasions. However, the affiants state that Santana "consistently" used the aforementioned left side door under the awning to access the building and that they "have not observed anyone other than Santana utilize this door and believe it leads to a rear apartment." Affidavit, ¶ 308(b).
                                                            Page 8 of 26
            B. ADDITIONAL FINDINGS OF FACT FROM THE HEARING 
            Noonan and Sgt. Daniel Clemens ("Clemens") were the co-case officers that led the investigation of the DTO.[10]
            1.15 —17 Ames St. 
            The building at issue in the Search Warrant is a three-family residential building numbered 15 — 17 Ames St. ("Building"). Santos has owned the Building since 2013.
            The Building is located in a thickly settled residential area containing mostly multifamily homes. The addresses of the buildings on the street increase from left to right when facing the Building.
The Building contains a basement and three floors, and is yellow in color. There are four utility meters attached to the front of the Building (facing Ames St.).
            The front of the Building (facing Ames St.) has an enclosed front porch with a single exterior door that is reached from Ames Street by walking up three steps. Inside the enclosed front porch are two doors and at least three mailboxes on the interior wall. These two interior doors lead to three different apartments. The interior door on the left leads to an apartment on the first floor with an address of 15 Ames St. The interior door on the right leads to two apartments, one on the second floor and one on the third floor, both of which have addresses of 17 Ames St. Ms. Grullon and her family occupied the second floor apartment.
---------------------------
[10] Noonan is a well-trained and highly experienced narcotics trafficking investigator. He has extensive experience conducting surveillance and controlled buys of narcotics, working with confidential informants, interacting with drug dealers and users, and drafting and executing search warrants in trafficking investigations. Noonan has significant training and experience regarding the composition, street value, street nomenclature, packaging, and distribution of narcotics in Massachusetts (especially in Lawrence) such as fentanyl, crack, cocaine, and heroin.
                                                            Page 9 of 26
            The basement is mostly unfinished and used for storage. The only finished area of the basement is a small finished room and adjacent bathroom located in the rear corner of the Building (collectively, "Finished Room"). The Finished Room has a door with a lock. Santos allowed Santana to use the Finished Room. Santana would sometimes stay overnight there.[11]
            There is a paved walkway on the left side of the Building. Approximately halfway down the left side walkway is a set of three stairs that leads up to a landing. The landing is covered by an awning. Immediately on the other (far) side of the landing is a set of three stairs that leads back down to the walkway. Under the awning is an unmarked, white exterior door containing six frames of glass on the top ("Left Side Door"). The Left Side Door contains a door handle and deadbolt lock on the left (when facing the door from the outside).
            The Left Side Door opens to the interior of the first floor of the Building from left to right. Immediately inside the Left Side Door on the left is an open interior entryway (i.e., without a door) containing a set of stairs that lead to one of the second floor apartments. Immediately inside the Left Side Door on the right is an unmarked interior door that opens to a flight of stairs that lead down to the unfinished portion of the basement.
            On the right side of the Building is an exterior door at ground level that leads into the unfinished basement. There is also a grass walkway and a parking area on the right side.
---------------------------
[11] Santos always considered the Finished Room an "apartment" with a mailing address of 17 Ames St. although it does not have a kitchen. However, there is no dispute that the City of Lawrence regulates and assesses the Building as a three unit, not a four unit, residential building.
                                                            Page 10 of 26
            Due to the thickly settled, close-knit nature of the neighbors in the neighborhood, investigators reasonably believed it would be difficult to perform traditional surveillance of the Building. Therefore, investigators eventually installed a pole camera on a telephone pole diagonally across Ames Street from the front of the Building.
                        2. Investigation Involving Left Side Door
            As mentioned above, investigators frequently observed Santana entering and exiting the Building, and believed he used the Building to stash drugs. Most of those observations were made via the pole camera. The pole camera showed the right side and front of the Building. The left side of the Building, including the left side walkway and Left Side Door, could not be seen via the pole camera.
            Although Noonan observed Santana enter the Building on a few occasions via the front porch and the right side basement door, most of the time he observed Santana approach the Building from the left side walkway and return to his vehicle (which Santana usually parked on the street near the left side of the Building) from the left side walkway. However, Noonan never observed Santana use the Left Side Door because the pole camera did not allow a view of that door. Rather, Noonan reasonably concluded that Santana accessed the Building through the Left Side Door on the multiple occasions Santana was observed arriving at the Building and entering the left side walkway. Noonan reached this conclusion based on the layout of left side walkway, which requires anyone walking down the walkway to walk up the short set of stairs to the landing under the awning that leads to the Left Side Door.[12]
---------------------------
[12] It is conceivable that, instead of accessing the Building via the Left Side Door, Santana could have travelled to the rear of the Building by walking down the short set of stairs from the landing outside the Left Side Door. However, there is no way to enter the Building from the rear and the pole camera would have shown Santana accessing the Building from the other two access points (i.e., the door to the front enclosed porch and the basement door on the right side of the Building). Therefore, the evidence supports an inference that Santana accessed the Building via the Left Side Door on the multiple occasions when investigators observed him enter the left side walkway.
                                                            Page 11 of 26
            Prior to applying for the Search Warrant, Noonan understood that the physical address of the Building is 15 — 17 Ames St. and, based on the number of utility meters, he believed that the Building had four apartments. Although officers observed a number of mailboxes inside the front porch, they were unable to see any names on the mailboxes.
            Noonan has resided in multi-unit residential buildings and he has been inside numerous multi-unit residential buildings in Lawrence (and elsewhere). Based on his
experience, Noonan believed that: (a) the left interior door inside the enclosed front porch served an upstairs apartment with an address of 15 Ames St.; (b) the right interior door inside the porch served a first-floor apartment with an address of 17 Ames St.; and, (c) the Left Side Door accessed a rear apartment with an address of 15 Ames St. (i.e., the left side of the Building is 15 Ames St. and the right side is 17 Ames St.). Noonan was also aware of the door to the basement on the right side of the Building.
                        3. Execution Of Search Warrant
            At the direction of O'Brien, officers executed the Search Warrant during the morning hours of June 19, 2019.[13]
            O'Brien and several other officers announced their presence and entered the Building through the Left Side Door using a battering ram to open the door. Based on
---------------------------
[13] Neither O'Brien nor any other officer involved in the investigation of the DTO, including Noonan, had been inside the Building prior to June 19. Moreover, neither Noonan nor Santana was present on June 19 for the execution of the Search Warrant. The investigatory team had previously arrested Santana at another location.
                                                            Page 12 of 26
the description in the Search Warrant, O'Brien expected the Left Side Door to open into an apartment used by Santana. Upon entering, he was surprised to find the aforementioned entryway to a flight of stairs and the door to the basement.
            Upon entering, O'Brien and fellow officers went up the interior flight of stairs. At the top of the stairs was a door to an apartment, which they opened and entered by using a battering ram after announcing their presence. Meanwhile, other officers opened the other interior door inside the Left Side Door and went down the flight of stairs to the basement. Those officers went into the basement to perform a protective sweep and were surprised to find the Finished Room.
            Upon entering the second floor apartment, officers encountered Grullon and other occupants. After a short conversation with the occupants, O'Brien realized that Santana did not occupy that apartment and it was not the location authorized by the Search Warrant. Meanwhile, a member of the DTO investigatory team, DEA Special Agent Dunn ("Dunn"), went to the third floor apartment and spoke with Santos who told Dunn that the defendant resided in the basement of the Building.
            Upon learning that Santana occupied the Finished Room, O'Brien went to the basement and entered the Finished Room with other officers by use of a battering ram after announcing their presence. The Finished Room was unoccupied and had very little furniture, household items, or personal belongings.
            Officers discovered and seized contraband inside the Finished Room.
                                                            Page 13 of 26
II. CONCLUSIONS OF LAW
            As stated, Santana seeks the suppression of all evidence seized by police in the Finished Room pursuant to the Search Warrant on June 19, 2019. After the hearing, he advances two arguments in support of the Motion. First, he asserts that the place to be searched set forth in the Search Warrant lacks sufficient particularity and, thus, runs afoul of the Fourth Amendment of the United States Constitution, Article 14 of the Massachusetts Declaration of Rights, and G.L. c. 276, § 2. Second, Santana contends that, even if the description of the place to be searched in the Search Warrant is sufficiently particular, the search of the Finished Room was outside the scope of the warrant's authority "[b]ecause the basement is an entirely separate apartment unit that is not within the curtilage of the rest of 15 Ames St."[14]
            A. THE LEGAL FRAMEWORK
            "The Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights require that a search warrant may issue only upon a showing of probable cause." Commonwealth v. Morin, 478 Mass. 415, 425 (2017) (citing Commonwealth v. Valerio, 449 Mass. 562, 566 (2007)); see also Commonwealth 
---------------------------
[14] In the Motion, Santana argues ". . . the application failed to sufficiently connect the defendant to the target apartment such that it established a substantial basis that drugs would probably be there." However, the law does not require a nexus between a specific person and the place to be searched. Rather, the law requires a nexus between criminal activity and the place to be searched. Commonwealth v. Pina, 453 Mass. 438, 440 — 441 (2009). Moreover, the Court observes that the aforementioned fleeting reference to an alleged deficiency in the nexus requirement is the only place in the defendant's voluminous submissions that he advances such an argument and he conceded at the hearing that the affidavit sufficiently established such a nexus. Thus, Santana has waived this basis to challenge the seizure of the evidence. See Mass.R.Crim.P. 13(a)(2) (pretrial motion "shall state the grounds on which it is based and shall include in separately numbered paragraphs all reasons, defenses, or objections then available, which shall be set forth with particularity."). Nevertheless, the Court has reviewed the sufficiency of the information in the affidavit and concludes it "'provide[s] a substantial basis for concluding that evidence connected to the crime will be found on the specified premises.'" Commonwealth  v. Escalera, 462 Mass. 636, 642 (2012) (citation omitted).
                                                            Page 14 of 26
v. Alexis, 481 Mass. 91, 101 - 102 (2018) (citing Commonwealth v. Keown, 478 Mass. 232, 237 (2017), cert. denied, 138 S. Ct. 1038 (2018)) (same). Moreover, "G.L. c. 276, § 2B, provides a statutory prohibition against the admission of [] evidence" obtained pursuant to a search warrant lacking in probable cause. Commonwealth v. Upton, 394 Mass. 363, 366 (1985). "[A]rt. 14 provides more substantive protection to criminal defendants than does the Fourth Amendment in the determination of probable cause." Id. at 373.
            "Probable cause means a 'substantial basis' to conclude that 'the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues.'" Alexis, 481 Mass. at 102 (quotation and citations omitted). "A 'substantial basis' means no more and no less than that lay) affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues." Id. (citation omitted). Furthermore, "[a] magistrate's determination of probable cause is accorded
'considerable deference.'" Commonwealth v. Holley, 478 Mass. 508, 521 (2017)
(citation omitted). Finally, "[t]he probable cause inquiry is limited to the 'four corners of the affidavit." Keown, 478 Mass. at 238 (citations omitted).
                                                            Page 15 of 26
B. THE SEARCH WARRANT SUFFICIENTLY DESCRIBES THE PLACE  TO BE SEARCHED 
            As stated, Santana first argues in the Motion that the description of the place to be searched set forth in the Search Warrant fails to describe the place to be searched with sufficient particularity.
            "In order to be valid, a warrant must 'particularly describe the place to be searched and the persons or things to be seized,' as required by the Fourth Amendment to the United States Constitution, art. 14 of the Declaration of Rights of the Massachusetts Constitution, and G.L. c. 276, § 2." Commonwealth v. Gonzalez, 39 Mass. App. Ct. 472, 476 (1995); see also Commonwealth v. Walsh, 409 Mass. 642, 644 (1991) (same).[15]"Th[ese] particularity requirement[s] 'both define[] and limit[] the scope of the search and seizure, thereby protecting individuals from general searches, which was the vice of the pre-Revolution writs of assistance." Keown, 478 Mass. at 239 (quoting Preventive Med. Assocs., Inc. v. Commonwealth, 465 Mass. 810, 830 (2013), quoting Commonwealth v. Balicki, 436 Mass. 1, 8 (2002)).
            The SJC has "stated that the dual purposes of the particularity requirements of G.L. c. 276, § 2, and art. 14 are (1) to protect individuals from general searches and (2) to provide the Commonwealth the opportunity to demonstrate, to a reviewing court, that the scope of the officers' authority to search was properly limited." Valerio, 449 Mass. at
---------------------------
[15] The Fourth Amendment states that "no [w]arrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." While Article 14 requires a search warrant to be "accompanied with a special designation of the persons or objects of search, arrest, or seizure. . . and with the formalities prescribed by the laws." In addition, G.L. c. 276, § 2, requires that “[s]earch warrants [] designate and describe the building, house, place, vessel or vehicle to be searched . . . . and shall be directed to the . . . police officer, commanding him to search . . . the building, house, place, vessel or vehicle where the property or articles for which he is required to search are believed to be concealed . . .."
                                                            Page 16 of 26
566 - 567 (citations omitted). "A related purpose of the particularity requirement of the Fourth Amendment, stated by the United States Supreme Court . . . is to provide necessary information to an individual whose property is being searched or seized." Id. at 567 (internal citations omitted).[16]
            Moreover, as the SJC has repeatedly emphasized, "[u]nder G. L. c. 276, .. . on motions to suppress, 'the judge may consider only the affidavit or affidavits presented to the magistrate.' . . . Subsequent oral testimony cannot be relied on to establish probable cause, . . . , or to expand the officer's knowledge." Commonwealth v. Treadwell, 402 Mass. 355, 358 n.4 (1988) (internal citations omitted). "Although .. . the knowledge of the executing officers can be a relevant consideration in resolving noncrucial ambiguities in a warrant [such as ambiguities in the description of the place to be searched], .. ., 'police may not expand the warrant beyond those facts known to them.'" Id. at 359 (internal and external citations omitted).
                        1. The Description Of, And Information About, The Place To Be  Searched In This Case 
            Here, the face of the Search Warrant provides the following description of the place to be searched directly under preprinted language that requests the author to "identify the exact location or description of the place(s) to be searched":
15 Ames Street, Rear Apartment, Lawrence, MA, see Addendum B, which in [sic] incorporated herein by reference.
which is occupied by and/or in the possession of: Alberto Santana (DOB 02/23/1983)
---------------------------
[16] Our appellate courts "make no distinction between art. 14 and the Fourth Amendment in [their] analysis [of the particularity requirement]." Walsh, 409 Mass. at 644 - 645 (citations omitted); see also Valerio, 449 Mass. at 566 ("Our cases do not distinguish between the statutory requirement of particularity, as set forth in G. L. c. 276, § 2, and the requirements of particularity under the Constitutions of the Commonwealth and of the United States.").
                                                            Page 17 of 26
Ex. 1, Search Warrant (emphasis added).
            Addendum B to the Search Warrant states, in pertinent part:
                        15 Ames Street, Lawrence, MA, which can be described as a multiunit residence with yellow siding. When facing the residence from Ames Street, the main entryway is inside of a small porch . . . . When facing the residence, directly to the left of the main entryway is an alley that runs the length of the residence. Approximately halfway down the alley is a set of stairs that leads to a white door with glass panes on its top half, a handle on its left said [sic], and a small awning above it. This is the door that Alberto Santana consistently [sic] has consistently used to access the residence. We ... believe it leads to a rear apartment. Below is an image of 15 Ames Street [ ] with a red circle over the alleyway area where the door consistently used by Santana is located.[17]
Ex. 1, Search Warrant, Addendum B (emphasis added).
                        2. The Search Warrant Specifies The Place To Be Searched With  Sufficient Particularity 
            There is no question that the Search Warrant directed officers to a specific door used frequently by Santana to access the Building, and authorized the search of a "rear apartment" used by Santana that could be accessed through that specific door. The question for the Court is whether the Search Warrant specifies the place to be searched with sufficient particularity to satisfy the Fourth Amendment, Article 14, and G.L. c. 276, § 2. In order to answer that question, the Court must address the rulings in three cases cited by the parties: Maryland v. Garrison, 480 U.S. 79 (1987), Commonwealth v.  Treadwell, 402 Mass. 355 (1988), and Commonwealth v. Carrasco, 405 Mass. 316 (1989).
            In Maryland v. Garrison, 480 U.S. 79 (1987), "Baltimore police officers obtained and executed a warrant to search the person of Lawrence McWebb and 'the premises
---------------------------
[17] As stated, a small color photograph of what appears to be the front of the Building with a circle around an area on the left side of the Building is set forth in Addendum B.
                                                            Page 18 of 26
known as 2036 Park Avenue third floor apartment." Id. at 80. "When the police applied for the warrant and when they conducted the search pursuant to the warrant, they reasonably believed that there was only one apartment on the premises described in the warrant. In fact, the third floor was divided into two apartments, one occupied by McWebb and one by respondent Garrison." Id. While in Garrison's apartment, police discovered contraband, which was the subject of Garrison's conviction for drug offenses. Id. The Supreme Court found that "the case present[ed] two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." Id. at 84 (citation omitted).
            With respect to the first question, the Supreme Court stated:
In this case there is no claim that the "persons or things to be seized" were inadequately described or that there was no probable cause to believe that those things might be found in "the place to be searched" as it was described in the warrant. With the benefit of hindsight, however, we now know that the description of that place was broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor of the building at 2036 Park Avenue. The question is whether that factual mistake invalidated a warrant that undoubtedly would have been valid if it had reflected a completely accurate understanding of the building's floor plan.
Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude respondent's apartment from the scope of the requested warrant. But we must judge the constitutionality of their conduct in light of the information available to them at the time they acted. Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued. Just as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant. The validity of the
                                                            Page 19 of 26
warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.
Id. at 85 (emphasis added). Therefore, the Supreme Court held "that the warrant, insofar as it authorized a search that turned out to be ambiguous in scope, was valid when it issued." Id. at 86.
            With respect to the second issue in Garrison regarding the reasonableness of the manner in which the warrant was executed, i.e., "[t]he question whether the execution of the warrant violated respondent's constitutional right to be secure in his home," Id. at 87, the Supreme Court noted that "[i]f the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apartment." Id. at 86. "Moreover, the . . . officers .. . were required to discontinue the search of [Garrison's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." Id. at 87. In ruling that the search of Garrison's apartment pursuant to the warrant passed constitutional muster, the Supreme Court found that the executing "officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable," and "was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." Id. at 88.
                                                            Page 20 of 26
            In Commonwealth v. Treadwell, 402 Mass. 355 (1988), police searched defendant Treadwell's apartment pursuant to a warrant that authorized a search of "'the front apartment on the 2nd floor above apartment #17 located at 50C Memorial Road . . . having a yellow bumper sticker on it stating 'Make My Day." Id. at 357. In fact, Treadwell's apartment was one of two "front" apartments on the second floor, although the apartment door had the yellow bumper sticker on it. Id. However, "Treadwell's apartment . . . [wa]s not the apartment directly above apartment no. 17; Treadwell's apartment [wa]s above no. 16." Id. at 358.
            The SJC found that "[t]he issue here is 'whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched which is not the one intended to be searched under the search warrant.' Id. at 359 (quoting Commonwealth v. Rugaber, 369 Mass. 765, 768 (1976)). The SJC placed importance on the fact that "[t]he affidavit contain[ed] information from two informants, both of whom specifically and unmistakably locate[d] the apartment to be searched 'directly above No. 17.' Significantly, the location of the apartment [wa]s the only consistent information from both informants." Id.
            In holding that the search warrant "failed to describe adequately the premises to be searched as required by G.L. c. 276, §§ 1 and 2," Id. at 361, the SJC observed that "[t]his [wa]s not a case in which the police gained familiarity with the premises through direct observation and then inadvertently misdescribed the premises in an affidavit. The police were given specific information, recorded it accurately, and then searched a different apartment." Id. at 360.
                                                            Page 21 of 26
            In Treadwell, the SJC further stated:
The specificity of the apartment's location in the warrant and the location of the bumper sticker on a different apartment door created an obvious ambiguity in the description of the place to be searched. In effect, the warrant left the police with discretion to choose between the apartment directly above no. 17 and the apartment with the bumper sticker on the door, even though probable cause existed to search only one apartment.
Id. at 361.
            Finally, in Treadwell, the SJC also noted that the ruling in Garrison did not apply because "the ambiguity of multiple front apartments -- one above no. 17, and the other with a bumper sticker on the door -- was readily and objectively apparent to the police." Id. at 360 n.8 (emphasis added).
            In Commonwealth v. Carrasco, 405 Mass. 316 (1989), "[t]he warrant . . . authorized a search of '83 Franklin Street, 2nd floor .. . occupied by Jesus (L.N.U.).'" Id. at 323. Unbeknownst to the police, the second floor at that location contained "two distinct apartments with distinct occupants," but only one of which was occupied by the defendants. Id. In seeking to suppress evidence seized during the search on the grounds of insufficient particularity of the place to be searched in the warrant, "[t]he[ defendants] argue[d] that the warrant [ ] impermissibly left the police with discretion to search either apartment although probable cause existed to search only one of them." Id. at 323. The SJC disagreed. Id. at 324.
            Citing the United States Supreme Court decision in Maryland v. Garrison, 480 U.S. 79 (1987), the SJC in Carrasco observed that the dispositive question was whether the search warrant affiant should have known that the second floor had two apartments
                                                            Page 22 of 26
when she applied for the warrant. Id. at 324. The SJC "answer[ed] that question in the negative." Id. In so doing, the SJC stated:
We conclude, as did the Appeals Court in Commonwealth v. Demogenes, 14 Mass. App. Ct. 577, 582 (1982), that the police in this case, proceeding on an informant's information with respect to "the" second-floor apartment, were not required to risk disclosure of their surveillance, and thereby jeopardize their investigation, by going to the second floor at 83 Franklin Street before applying for the warrant. For the same reason, we conclude that the police were not required to interview the owner or other occupants of the building or to take other steps that might disclose their interest in the premises. We conclude, therefore, that the warrant was valid.
Carrasco, 405 Mass. at 324 — 325 (internal citations omitted)
            In Carrasco, the SJC went on to reconcile its holding in that case with its earlier holding in Treadwell, as follows:
Nothing in [ ] Treadwell, . . . requires a different result. The Federal exception to the particularity requirement relied on in Maryland v.  Garrison, [ ] was not at issue in Treadwell. In Treadwell, the warrant specified two separate distinguishing factors to designate the apartment to be searched: that the apartment was "above No. 17," and that it had a sticker on its door reading "Make My Day." . . . Because no apartment had both characteristics and each of two apartments had one of them, this court held that the warrant gave discretion to the police to choose either apartment and thus was invalid. . . . Because the principles relied on in Treadwell and Maryland v. Garrison apply in different contexts, those two decisions do not conflict with one another. Maryland v.  Garrison, not Treadwell, controls the present case.
Id. at 325 (citations omitted) (emphasis added).
            Reading Garrison, Treadwell, and Carrasco together, this Court rules that, when faced with an ambiguity in the description of the place to be searched, a reviewing court must determine if the description required the police to choose between either of two (or more) locations that each fall within the property description in the warrant. See Carrasco, 405 Mass. at 324. In such a case, the principles in Garrison and Carrasco 
                                                            Page 23 of 26
apply and require the reviewing court to determine, "in light of the information available to them at the time they acted," if the officers should have known that the place to be searched described two separate places. Garrison, 480 U.S. at 85. On the other hand, if the description of the place to be searched in the search warrant requires the police to choose between two (or more) "objectively apparent" invalid locations (i.e., neither the target location nor another location fit within the property description in the warrant), the description lacks sufficient particularity to satisfy the Fourth Amendment, Article 14, and G.L. c. 276, § 2. Treadwell, 402 Mass. at 360 n.8; see also Commonwealth v. Gonzalez, 2011 Mass. App. Unpub. LEXIS 450, ** 1 - 2 (April 8, 2011) (affirming allowance of motion to suppress where "[t]he warrant and an application for the warrant authorized the search of '75 West Street Apt.3.' The warrant further specified that `Apt.3 is located on the 2nd floor right side of the dwelling.' However, when the executing officers entered the building, they realized that Apt.3 was located on the left side of the building and a different apartment, Apt.4, was located on the right. Even though the officers saw [the defendant], the target of the investigation, through the open door of Apt.3, which they eventually entered in order to arrest Gonzalez, they searched Apt.4, where they found and seized [contraband].").
            Here, the search warrant authorized the search of a "rear apartment" at the Building occupied by Santana, and officers "consistently" observed Santana entering the Building via a specific door to the exclusion of other people. Like in Garrison and Carrasco, at the time the officers applied for the Search Warrant, there were no obvious, objective facts available to them that suggested that the Left Side Door accessed both a stairwell to a second floor apartment and a stairwell to a makeshift
                                                            Page 24 of 26
"apartment" in the rear corner of the basement. Further, the officers were not required to risk disclosure of their surveillance of Santana and jeopardize their long-term investigation of the DTO by entering the Left Side Door of the Building before applying for the Search Warrant, even by using a "ruse" as Santana suggests.
            Moreover, given the reference to the "rear apartment" "occupied by Santana," the description in the Search Warrant adequately allowed the executing officer to locate and identify the place to be searched with reasonable effort, and there was no reasonable probability that a place other than the one intended to be searched might be mistakenly searched. See Walsh, 409 Mass. at 645 ("The relevant inquiry with respect to the adequacy of a search warrant's description of the premises to be searched is whether the description is sufficiently complete to allow the executing officer to locate and identify the place to be searched with reasonable effort, and whether there is any reasonable probability that a place other than the one intended to be searched under the warrant might be mistakenly searched.") (citations omitted).
            Therefore, so much of the Motion that seeks the suppression of evidence because the description of the place to be searched in the Search Warrant lacked sufficient particularity is DENIED.
                                                            Page 25 of 26
C. THE OFFICERS' SEARCH OF THE FINISHED ROOM WAS WITHIN  THE SCOPE OF THE SEARCH WARRANT 
            As stated, Santana also argues that, even if the description of the place to be searched in the Search Warrant is sufficiently particular, the officers' search of the Finished Room was outside the scope of the warrant's authority "[b]ecause the basement is an entirely separate apartment unit that is not within the curtilage of the rest of 15 Ames St." However, this argument fails because, as discussed, the Search Warrant authorized the search of the apartment "occupied by and/or in the possession of Santana. The Finished Room was the specifically described place to be searched, not simply "curtilage" of another designated place.[18]
            Therefore, so much of the Motion that seeks the suppression of evidence because the place searched by police was outside the scope of the Search Warrant is DENIED.
ORDER
            For the above reasons, it is HEREBY ORDERED that Defendant's Motion To Suppress Evidence And Evidentiary Hearing (Paper No. 7) is DENIED.
@/s/Jeffrey T. Karp Associate Justice, Superior Court
@August 31, 2020
---------------------------
[18]To the extent that Santana's argument is based on the testimony of Santos that the address of the Finished Room is 17 Ames St., not 15 Ames St., that argument fails because the physical address of the Building is 15 — 17 Ames St. and the Finished Room is clearly located within the Building. See e.g., Walsh, 409 Mass. at 645 (holding that the omission of the street address and town of the house to be searched did not invalidate a search warrant that otherwise described the premises with particularity and identified the occupant).
                                                            Page 26 of 26